2013 CO 50

CONCERNING THE APPLICATION FOR WATER RIGHTS OF The CITY AND COUNTY OF DENVER, Acting BY AND THROUGH ITS BOARD OF WATER COMMISSIONERS IN DOUGLAS, ARAPAHOE, DENVER, BROOMFIELD, WELD, ADAMS, AND PARK COUNTIES, COLORADO,

City and County of Denver,
Applicant–Appellee

v.

City of Englewood, Opposer–Appellant

and

Arapahoe County Water and Wastewater Authority; Bear Creek Development Corporation; Bijou Irrigation Company; Bijou Irrigation District; Centennial Water and Sanitation District; Center of Colorado Water Conservancy District;

City and County of Broomfield; City of Aurora; City of Commerce; City of Lakewood; City of Louisville; City of Thornton; City of Westminster; Consolidated Ditches of Water District No. 2; Coors Brewing Company; James R. Hall, Division Engineer; East Cherry Creek Valley Water and Sanitation District; Water Activity Enterprise, Inc.; Fairmount Cemetery Company; Farmers High Line Canal and Reservoir Company; Farmers Reservoir and Irrigation Company; Fulton Irrigation Ditch Company; Glenmoor Country Club; Henrylyn Irrigation District; New Brantner Extension Ditch Company; Northern Colorado Water Conservancy District; Parker Water & Sanitation District; Public Service Company of Colorado, dba Xcel Energy; Platte Valley Irrigation Company; Central Colorado Water Conservancy District; Hal D. Simpson, State Engineer; South Adams County Water and Sanitation District; South Suburban Park Recreation District; The City of Greeley; The Upper Cherry Creek Water Association; The Denver Country Club; City of Brighton; and United Water & Sanitation District, Opposers–Appellees.

Supreme Court Case No. 12SA196

Supreme Court of Colorado,
En Banc.

July 1, 2013

Attorneys for Applicant–Appellee City and County of Denver: Daniel John Arnold Casey S. Funk Patricia L. Wells Denver, Colorado.

Attorneys for Opposer–Appellant City of Englewood: Berg Hill Greenleaf & Ruscitti LLP Jon N. Banashek David Gower Hill Heidi C. Potter Ann Marie Rhodes Boulder, Colorado.

Justice RICE delivered the Opinion of the Court.

¶ 1 In this direct appeal from the division one water court, we consider whether Denver may use properly quantified transmountain lawn irrigation return flows ("LIRFs") as a substitute supply of water for its Civil Action ("C.A.") 3635 exchanges. We hold that properly quantified transmountain LIRFs are legally indistinguishable from reusable transmountain effluent and, therefore, the water court correctly determined that Denver may use its properly quantified transmountain LIRFs as substitute supply for the appropriative rights of exchange decreed in C.A. 3635. In addition, we affirm the water court's holding that junior appropriators, like Englewood, cannot claim injury premised solely upon the proper operation of the C.A. 3635 exchanges. As such, the water court correctly decided Denver's Motion for Determination of a Question of Law under C.R.C.P. 56(h).

## I. Facts and Procedural History

¶ 2 We first briefly describe the history of Denver's C.A. 3635 decree to provide the necessary context for our legal analysis. Denver filed a statement of claim in C.A. 3635 on July 22, 1968, claiming an appropriative right to the "entire flow of the South Platte River" in former Water District No. 8. Denver claimed the South Platte River water for an array of beneficial uses, including the "exchange ... of water by the use of any public stream or its water in substitution for water supplied or taken by [Denver]." Denver asserted a July 1921 appropriation date and named seven different points of diversion on the South Platte River for the claimed appropriative rights of exchange. It did not specifically name any source of substitute supply.

¶ 3 The water referee heard testimony in C.A. 3635 regarding Denver's intent to use and reuse Colorado River water for substitute supply purposes in October 1971. The Douglas County district court issued the decree in C.A. 3635 on May 17, 1972. The decree included Denver's requested South Platte River exchanges with a July 4, 1921 priority, and adopted the language from Den-ver's statement of claim describing one purpose of the decreed right as "effectuating an exchange ... of water by the use of any public stream or its water in substitution for water supplied or taken by [Denver]." The decree did not include any specific substitute water supplies, any specific exchange reaches, or any particular process for adding new substitute supplies.

¶ 4 In 1984, the water court approved a change decree in Case No. W–8783–77 adding Chatfield Reservoir as an additional point of diversion for the C.A. 3635 exchanges. To effectuate the C.A. 3635 exchanges at Chatfield, the water court stated that Denver intended to use "the waters of the South Platte River occurring at or above the Chatfield Dam which may be stored in Chatfield Reservoir by exchange with water introduced into the South Platte River system from the Colorado River system, whether such Colorado River system water shall have been used previously in the South Platte River watershed or not." Pursuant to the original C.A. 3635 decree's requirements for subsequently added points of diversion, the water court assigned a 1977 priority date to the exchanges carried out using Chatfield Reservoir.

¶ 5 Eight years after Denver added Chatfield Reservoir as a point of diversion for the C.A. 3635 exchanges, this Court interpreted the C.A. 3635 decree in *Denver v. Englewood*, 826 P.2d 1266, 1272 (Colo.1992). The Court held that the decree, in conjunction with Denver's 1968 statement of claim and the 1971 testimony, sufficiently notified downstream appropriators on the South Platte River that Denver intended to use imported Colorado River water, including transmountain effluent from Metro Sewer, as substitute supply for the decreed exchanges. *Id.* The Court reasoned that because Denver has "the rights of re-use, successive use and disposition of foreign water," and because the right to reuse effluent or imported water existed in 1968 when Denver filed its statement of claim in C.A. 3635, the effluent and imported water at issue "was encompassed by the phrase 'any public stream' in Denver's statement of claim and the water court's decree." *Id.* at 1273 (citing *City & Cnty. of*

*Denver v. Fulton Irrigating Ditch Co.,* 179 Colo. 47, 52, 506 P.2d 144, 147 (1972) (*"Fulton"*)).

¶ 6 Around the same time as the *Englewood* decision, Denver began adding LIRFs to its pending well augmentation plans as a source of substitute supply. Denver also described its plan to quantify transmountain LIRFs for substitute supply purposes in a 1993 letter to the Bureau of Reclamation. Additionally, in 1996, Denver articulated its intent to acquire and use gravel pits for downstream storage of properly quantified transmountain LIRFs on the South Platte River.

¶ 7 In 2004, Denver filed the application underlying this appeal in the water court for "a determination of a water right" under section 37–92–302(1)(a), C.R.S. (2012). It requested approval of its use of properly quantified transmountain LIRFs as substitute supply for the appropriative rights of exchange decreed in C.A. 3635. Englewood, as a junior appropriator on the South Platte River, filed a statement of opposition to Denver's application. During discovery, Denver filed a motion for determination of a question of law in the water court pursuant to C.R.C.P. 56(h) (the "Rule 56(h) Motion") asking the water court to decide: (1) whether Denver may use properly quantified LIRFs as substitute supply for exchanges under the C.A. 3635 decree; and (2) whether water users within the exchange reach, junior to the C.A. 3635 right, may assert a claim of injury based solely upon the use of LIRFs as a source of substitute supply.

¶ 8 With respect to the first issue, the water court found no legal distinction between reusable, properly quantified transmountain LIRFs and reusable imported water returning to the South Platte River as wastewater effluent. Relying on this Court's interpretation of the C.A. 3635 decree in *Englewood*—and reiterating Denver's broad intent to use and reuse imported Colorado River water as evidenced by Denver's statement of claim and the related testimony—the water court concluded that Denver may use properly quantified transmountain LIRFs as substitute supply for exchanges under the

C.A. 3635 decree, just as it may reuse imported transmountain water returning to the stream as wastewater effluent.

¶ 9 On the second issue, the water court held that junior appropriators, like Englewood, cannot claim injury premised solely on the proper operation of the C.A. 3635 exchanges because junior water users have no expectation as to imported reusable water.

¶ 10 In addition to the Rule 56(h) Motion, Denver also filed a Motion for Protective Order after Englewood filed a Motion to Compel Denver to produce "all documentation related to any reports of George M. Bull who conducted a field survey of potential water resources in western Colorado on July 4, 1921." The water court granted Denver's Motion for Protective Order, and denied Englewood's Motion to Compel, on the grounds that Englewood's discovery of the requested Bull Reports was unlikely to lead to the discovery of admissible evidence, and would also be "oppressive and unduly burdensome" to Denver because of the "extremely broad nature of the request."

¶ 11 After the water court resolved the legal questions Denver presented in its Rule 56(h) Motion, granted Denver's Motion for Protective Order, and denied Englewood's Motion to Compel, the parties stipulated to a final decree subject to Englewood's right to appeal the water court's decisions on the discovery motions. Englewood subsequently directly appealed to this Court.

¶ 12 We now consider two issues: (1) whether the water court erred in concluding that properly quantified transmountain LIRFs are a decreed source of substitute supply for Denver's exchanges operated under its C.A. 3635 decree as modified by the W–8783–77 decree (collectively the "C.A. 3635 decree") under the original priority dates of those decrees; and (2) whether the water court erred in concluding that Englewood may not claim injury based solely on Denver's operation of exchanges through the use of properly quantified transmountain LIRFs as a substitute supply under the C.A. 3635 decree.[1]

---

1. We need not consider the third issue stated in the advisory listing of issues to be raised on

## II. Analysis

¶ 13 We first hold that the water court correctly concluded that Denver may use properly quantified transmountain LIRFs as a substitute supply for the appropriative rights of exchange decreed in C.A. 3635. Properly quantified transmountain LIRFs are legally indistinguishable from reusable transmountain effluent when used for substitute supply purposes. Thus, the water court properly concluded that Denver's right to use Colorado River water for exchange purposes under the C.A. 3635 decree encompassed the right to successively use properly quantified LIRFs attributable to the imported Colorado River water in addition to reusable Colorado River effluent from Metro Sewer.

¶ 14 Additionally, we affirm the water court's holding that junior appropriators, like Englewood, cannot claim injury premised solely upon the proper operation of the C.A. 3635 exchanges. Under this Court's decision in *City of Thornton v. Bijou Irrigation Company*, 926 P.2d 1, 68 (Colo.1996) ("*Bijou*"), junior water users have no legal expectation with respect to imported reusable water, and under *Englewood*, Denver has always intended to reuse its imported water through the C.A. 3635 exchanges. *See* 826 P.2d at 1272. Therefore, the water court correctly held that Englewood could not claim injury on account of Denver's operation of the senior exchanges decreed in C.A. 3635.

■ ¶ 15 We review the water court's resolution of these questions of law under C.R.C.P. 56(h) de novo. *West Elk Ranch, L.L.C. v. United States*, 65 P.3d 479, 481 (Colo.2002). To frame our de novo review of the legal issues on appeal, we summarize the relevant law on transmountain water rights and the use of LIRFs as substitute supply for exchanges. Consistent with this Court's prior interpretation of the C.A. 3635 decree in *Englewood*, we then apply these principles to the facts in this case to affirm the water court's conclusion that Denver may use its properly quantified Colorado River LIRFs as a source of substitute supply in its C.A. 3635 exchanges.

¶ 16 Next, we discuss the law informing the principle that junior appropriators cannot claim injury based on a senior water users' operation of an exchange using properly quantified transmountain LIRFs. Applying this legal framework, we consider the water court's order on this second issue de novo to conclude that the water court properly held that Englewood had no right to claim injury on account of Denver's operation of the C.A. 3635 exchanges.

### A. Transmountain Water and LIRFs as Substitute Supply

■ ¶ 17 Users of imported transmountain water "enjoy greater rights of use and reuse than do users of native water." *Bijou*, 926 P.2d at 66. More precisely, according to section 37–82–106(1), C.R.S. (2012),

[w]henever an appropriator has lawfully introduced foreign water into a stream system from an unconnected stream system, such appropriator may make a succession of uses of such water by exchange or otherwise to the extent that its volume can be distinguished from the volume of the streams into which it is introduced.

¶ 18 Consistent with this provision, this Court has recognized transmountain water users' rights to reuse and to make successive use of imported transmountain water to the maximum extent feasible to "minimize the amount of water removed from Western Colorado." *Fulton*, 179 Colo. at 54, 506 P.2d at 148; *see also Bijou*, 926 P.2d at 67–68.

■ ¶ 19 An appropriator who imports transmountain water need not have the intent to reuse or successively use that water at the time of the original appropriation to maintain the subsequent right of use. *Bijou*, 926 P.2d at 70. Rather, "the right to reuse simultaneously and automatically attaches" upon the water importer's appropriation of the relevant transmountain water. *Id.* at 68. In sum, then, "the owner of a water right which has been imported into a stream system has the right to successive reuse, to

appeal—whether the water court erred in granting Denver's Motion for Protective Order and denying Englewood's Motion to Compel—be-

cause our resolution of the first two issues obviates the need for us to remand this case for trial.

extinction, of the water." *Pub. Serv. Co. of Colo. v. Willows Water Dist.*, 856 P.2d 829, 833 n. 8 (Colo.1993) (citation omitted) (*"Willows"*); *see Bijou*, 926 P.2d at 68. Water users commonly use transmountain water, and reusable transmountain effluent, as substitute water supplies in exchanges. *See, e.g., Bijou*, 926 P.2d at 62, 66.

■ ¶ 20 This Court has also approved the use of properly quantified LIRFs resulting from the importation of non-tributary groundwater—another source of "foreign" water—used for substitute supply purposes in a plan for augmentation. *Willows*, 856 P.2d at 835. The same types of water are used for substitute supply purposes in plans for augmentation as are used for substitute supply purposes in exchanges. *Empire Lodge Homeowners' Ass'n v. Moyer*, 39 P.3d 1139, 1153–54 (Colo.2001) (describing a "substitute supply" as "water supplied to decreed water rights holders under an exchange or augmentation plan" that satisfies certain "quantity and quality requirement[s]"). Therefore, *Willows* stands for the proposition that a water user may use properly quantified LIRFs as substitute supply in an exchange just as it may use LIRFs as a substitute supply in a plan for augmentation. *See* 856 P.2d at 835.

¶ 21 This Court first addressed Denver's use of transmountain water as a substitute supply for its C.A. 3635 exchanges in *Englewood*. Specifically, the Court considered whether the statement of claim in C.A. 3635 provided sufficient notice of Denver's intent to use Colorado River water, including transmountain effluent from the Metro Sewer facility, as substitute supply for water diverted from the South Platte River under the C.A. 3635 exchanges. *Englewood*, 826 P.2d at 1268. The Court held "that the testimony before the referee in C.A. 3635 indicated that the use of transmountain water or effluent in the subject exchanges could be anticipated." *Id.* at 1272. It further interpreted Denver's statement of claim and the C.A. 3635 decree to conclude that because the "right to reuse effluent or imported water existed in 1968, when Denver's statement of claim was filed, the effluent and imported water [at issue] was encompassed by the phrase 'any public stream' in Denver's statement of claim and the water court's decree." *Id.* at 1273. Accordingly, the Court held that Denver intended in 1921 to use and reuse the appropriated Colorado River water as substitute supply for the C.A. 3635 exchanges. *Id.*

¶ 22 Although the primary issue in *Englewood* was whether Denver provided sufficient notice of its intent to use imported transmountain water as substitute supply, the case is also dispositive of Denver's intent at the time of its exchange appropriation in 1921. The *Englewood* decision definitively established that Denver intended to use and reuse Colorado River water as substitute supply for the exchanges decreed in C.A. 3635. *Id.* at 1272–73. It also recognized the right to reuse and successive use that transmountain appropriators have in their imported water, as described by this Court in *Fulton* and *Bijou*, and as codified at section 37–82–106(1). *Englewood*, 826 P.2d at 1272–73; *Fulton*, 179 Colo. at 52, 506 P.2d at 147; *see also Bijou*, 926 P.2d at 66–68.

¶ 23 With this precedent in mind, we now turn to the first issue in this case: whether the water court erred in concluding that properly quantified transmountain LIRFs are a decreed source of substitute supply for Denver's C.A. 3635 exchanges operated under the original 1921 and 1977 priority dates.

**B. Properly Quantified Transmountain LIRFs are Legally Indistinguishable from Reusable Transmountain Effluent**

■ ¶ 24 The water court correctly applied *Englewood* to effectuate the principle—consistent with this Court's precedent—that properly quantified transmountain LIRFs are legally indistinguishable from reusable transmountain effluent. Therefore, the water court did not err when it concluded that properly quantified transmountain LIRFs are a decreed source of substitute supply for Denver's C.A. 3635 exchanges under the original 1921 and 1977 priorities.

¶ 25 Recognizing that "the relevant conclusions of law are largely embodied in [*Englewood* ]," the water court applied the principles this Court laid out in that case to

logically categorize the use of properly quantified transmountain LIRFs for substitute supply purposes under the umbrella of the successive reuse rights that transmountain appropriators have in their imported water. The water court concluded that Denver's intent in 1921, as determined in *Englewood,* encompassed the right to successively use Colorado River water in the form of properly quantified LIRFs, just as it encompassed the right to use Colorado River effluent from Metro Sewer as a substitute supply. We agree with the water court's conclusion.

¶ 26 Just like reusable transmountain effluent, properly quantified transmountain LIRFs are a legitimate source of substitute supply in an exchange because these two types of return flows are legally indistinguishable. *See Willows,* 856 P.2d at 835; *Bijou,* 926 P.2d at 68–70. For example, the volume of water attributable to properly quantified transmountain LIRFs originated in a foreign stream, in this case the Colorado River, just like the volume of water that makes up reusable transmountain effluent. In addition, the foreign water comprising both reusable effluent and transmountain LIRFs was originally appropriated by a water user for beneficial use—here, as substitute supply for exchanges on the South Platte River. Finally, the importing water user acquires "the right to successive reuse, to extinction, of the [transmountain] water" upon appropriation. *Willows,* 856 P.2d at 833 n. 8; *see Bijou,* 926 P.2d at 68. Transmountain effluent and properly quantified transmountain LIRFs are two forms of imported water that may be successively reused to extinction under this right. As such, properly quantified transmountain LIRFs are legally indistinguishable from reusable transmountain effluent.

¶ 27 Therefore, the water court correctly concluded that Denver's intent at the time it appropriated the South Platte River water

for exchange purposes in 1921, as determined in *Englewood,* included the intent to use properly quantified transmountain LIRFs attributable to the volume of the imported Colorado River water for substitute supply purposes, just as it included the intent to use transmountain effluent from Metro Sewer.[2]

### C. Englewood Cannot Claim Injury as a Result of Denver's Operation of the C.A. 3635 Exchanges

 ¶ 28 The water court properly held that Englewood may not claim injury based solely on Denver's operation of the C.A. 3635 exchanges through the use of properly quantified transmountain LIRFs as a substitute supply. As stated above, an appropriator who imports transmountain water has the right to reuse and make successive uses of the properly quantified volume of water attributable to the amount of water imported as long as that volume can be properly quantified. *See Fulton,* 179 Colo. at 56, 506 P.2d at 149. This right "allows the flexible and efficient use of foreign water, minimizes the amount of water imported from the western slope, and recognizes that absent the importer's efforts, the water would never have been available for use or reuse." *Bijou,* 926 P.2d at 68. Thus, water users on the stream into which an appropriator imports transmountain water have no legal rights to the volume of water attributable to the transmountain diversion absent some other applicable legal mechanism, such as an exchange.

¶ 29 Here, Denver has long operated the C.A. 3635 exchanges to provide substitute supply to water users on the South Platte River with priorities senior to July 4, 1921, who would otherwise be injured by Denver's upstream South Platter River diversions. The C.A. 3635 exchanges, however, do not create any legal right to imported Colorado River water for South Platte River water users with priorities junior to 1921 or, with respect to the exchanges operated via Chat-

---

**2.** Englewood contends that the water court's interpretation of *Englewood* and the C.A. 3635 decree authorizes an "uncertain and open-ended decree." We disagree with this contention because the water court did not construe *Englewood*'s treatment of the "any public stream" language in the C.A. 3635 decree to give Denver

a blank check, dated with a 1921 priority, that could encompass any later-acquired water right used as substitute supply in the C.A. 3635 exchanges. Instead, the water court confined its analysis to Denver's intent with respect to the water it claimed for exchange purposes in 1921.

field Reservoir, 1977. As a junior water user, Englewood accordingly has no legal expectation with respect to Denver's transmountain water imported for use as a substitute supply for the C.A. 3635 exchanges—whether in the form of effluent or LIRFs—because water users on the stream into which an appropriator imports transmountain water have no legal rights to the volume of water attributable to the transmountain diversion absent some other applicable legal mechanism, and because the C.A. 3635 exchanges operate for the benefit of senior water users only.

¶ 30 In addition, our holding that Denver intended in 1921 to use properly quantified transmountain LIRFs for substitute supply purposes in the C.A. 3635 exchanges forecloses Englewood from asserting injury. As the water court correctly held, "Denver is merely exercising its senior priority" by using and reusing imported Colorado River water to effectuate the C.A. 3635 exchanges. Thus, as a matter of law, a junior water user like Englewood cannot base an injury claim solely on Denver's use of properly quantified transmountain LIRFs to operate its longstanding senior right to the C.A. 3635 exchanges. As such, we affirm the water court's conclusion that Englewood cannot claim injury based solely on Denver's operation of the C.A. 3635 exchanges through the use of properly quantified transmountain LIRFs as a substitute supply.

### III. Conclusion

¶ 31 We hold that Denver's intent to appropriate rights of exchange on the South Platte River using Colorado River water as a substitute supply with a 1921 priority, as determined in *Englewood,* included the intent to use properly quantified transmountain LIRFs attributable to the imported Colorado River water. These LIRFs are legally indistinguishable from the transmountain wastewater effluent Denver also intended to use as substitute supply for the C.A. 3635 exchanges.

¶ 32 Furthermore, we hold that Englewood may not claim injury based solely on Denver's operation of the C.A. 3635 exchanges through the use of properly quantified trans-

mountain LIRFs as a substitute supply. As a junior South Platte River appropriator, Englewood has no legal expectation with respect to the water Denver imported from the Colorado River for use as substitute supply in the C.A. 3635 exchanges.

¶ 33 We therefore affirm the Order of the water court on Denver's Rule 56(h) Motion.